**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| MARK BROWN, | CASE NO. 3:24-CV-02044-AMK |
| Plaintiff, | |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Plaintiff Mark Brown ("Plaintiff" or "Mr. Brown") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter is before the undersigned by consent of the parties under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 7.)

For the reasons set forth below, the Court **VACATES** and **REMANDS** the case pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should consider the entire record and provide a clear, accurate, and well-reasoned explanation to support his findings regarding the persuasiveness of all medical opinion evidence, including the medical opinion of treating physician Christopher Smallwood, M.D., and ensure that his stated rationale builds an accurate and logical bridge between the evidence and the result.

1

## I.      Procedural History

Mr. Brown filed a prior SSI application on December 31, 2018, alleging disability

beginning on January 18, 2017.  (Tr. 136.)  On May 6, 2020, an Administrative Law Judge

("prior ALJ") found Mr. Brown was not disabled from December 19, 2018, the date the

application was filed, through the date of the decision.  (Tr. 134-57.)  He sought review of the

decision by the Appeals Council, which declined to review the decision.  (Tr. 852.)

On May 5, 2021, Mr. Brown filed the instant application for SSI, alleging a disability

onset date of January 18, 2018.  (Tr. 158.)  He later amended the alleged onset date to May 7,

2020.  (Tr. 900-01.)  Mr. Brown alleged disability due to scoliosis, spondylolisthesis,

spondylolysis, chronic obstructive pulmonary lung disease ("COPD"), anxiety, and depression.

(Tr. 159.)  Mr. Brown's application was denied at the initial level (Tr. 158) and upon

reconsideration (Tr. 179), and he requested a hearing (Tr. 197-98).  On April 5, 2022, a

telephonic hearing was held before an ALJ.  (Tr. 106-33.)  On April 13, 2022, the ALJ issued a

decision, finding Mr. Brown has not been under a disability within the meaning of the Social

Security Act from May 7, 2020, through the date of the decision.  (Tr. 88-105.)  Mr. Brown

sought review of the decision by the Appeals Council.  (Tr. 257-58.)  On December 14, 2022, the

Appeals Council found no reason to review the decision, and Mr. Brown filed a Complaint in

this Court challenging the Commissioner's final decision denying his social security disability

benefits.  (Tr. 879, 886.)  Upon joint stipulation of the parties, the case was remanded to the

Commissioner pursuant to Sentence Four of 42 U.S.C. § 405(g).  (Tr. 886-87.)

On remand, the Appeals Council ordered that the ALJ: (1) determine whether new

evidence warranted a change in the 2020 decisional findings in accordance with AR 98-4(6) and

*Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997); (2) give further

consideration to the medical source opinions; (3) give further consideration to Plaintiff's residual functional capacity ("RFC") and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations; and (4) if warranted by the expanded record, obtain supplemental evidence from a vocational expert.  (Tr. 892-93.)

On February 23, 2024, a hearing was held before a new ALJ.  (Tr. 825-51.)  The ALJ held a supplemental hearing on August 19, 2024 (Tr. 1564-84) and issued a decision on September 19, 2024, finding Mr. Brown had not been disabled from May 5, 2021, the date the application was filed (Tr. 797-824).  Mr. Brown filed a Complaint seeking judicial review on November 22, 2024.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 8, 12, 13, 14.)

## II.      Evidence

### A.      Personal, Educational, and Vocational Evidence

Mr. Brown was born in 1984 and was 33 years old on the alleged disability onset date, making him a younger individual under Social Security regulations on the alleged onset date. (Tr. 159, 169.)  He did not complete a high school education.  (Tr. 287.)  Mr. Brown has not worked since January 18, 2018, the alleged onset date.  (Tr. 159, 169.)

### B.      Medical Evidence

Although the ALJ found severe physical and mental impairments (Tr. 803), Mr. Brown only challenges the ALJ's findings related to his physical limitations (ECF Docs. 8, 12, 14).  The evidence summarized herein therefore relates only to Plaintiff's physical impairments.

#### 1.      Relevant Treatment History

##### i.      Evidence Predating May 2020 ALJ Decision

On January 18, 2018, Mr. Brown underwent a surgical anterior approach lumbar interbody fusion at L5-S1 with a mechanical interbody device placement to treat lumbar

3

spondylolisthesis at L5-S1 level and spondylolysis, lumbar region.  (Tr. 393, 397.)  At a follow-up appointment in April 2018, Mr. Brown's surgeon, Robert Raymond Crowell, M.D., diagnosed him with lumbar spondylolysis at L5 and status post lumbar spinal fusion.  (Tr. 519.)  Dr. Crowell ordered x-rays of the lumbar spine, which showed: anterior interbody fusion at L5-S1 with intervertebral disc spacer in place; mild retrolisthesis of L2 on L3 redemonstrated; and mild dextroconvex scoliosis.  (Tr. 521.)  The remainder of the lumbar spine was in good anatomical alignment without evidence of acute fracture.  (*Id.*)

On January 31, 2019, Mr. Brown presented to Stephanie Ann Young, PA-C, at Marion Area Physicians Spine Surgery for a one-year follow-up from surgery.  (Tr. 539-41.)  He reported continued bilateral low back pain that had not improved with a recent course of physical therapy.  (Tr. 540.)  He walked and transferred without difficulty.  (*Id.*)  His pain was 7/10 but controlled with Tylenol and medical marijuana.  (*Id.*)  A physical examination showed no palpable tenderness or local deformity of the spine, strong and symmetric lower extremity motor function, and slow and cautious walking.  (Tr. 540-41.)  As Mr. Brown's back pain had failed to improve, PA-C Young ordered a CT scan of the lumbar spine.  (Tr. 541.)

The CT scan was performed on February 14, 2019 at Marion General Hospital.  (Tr. 542-56.)  It showed a mild anterior disc bulge and spur at L1-2, T12-L1, no evidence of spondylolisthesis or central spinal canal stenosis, and bilateral pars defect and foraminal narrowing at L5-S1.  (Tr. 545-56.)  At a follow-up appointment that day, Mr. Brown's physical examination findings were unchanged from the previous visit.  (Tr. 548.)  Mr. Brown was told to return in six months for a recheck.  (Tr. 549.)

On May 21, 2019, Mr. Brown presented to his primary care provider, Christopher Smallwood, M.D., at Marion Area Physicians Primary Care.  (Tr. 396-400.)  He reported his pain

4

was "really no better" and endorsed radicular pain, neuropathy, and numbness of his thoracic and lower spine.  (Tr. 398.)  He was not taking pain medication but was taking marijuana and diazepam.  (*Id.*)  He was also using a bone growth stimulator and following with spinal surgery. (*Id.*)  He had no constitutional, neurological, or psychological deficits on examination.  (Tr. 400.) Mr. Brown declined a referral to pain management, choosing to continue taking medical marijuana for pain.  (*Id.*)

Mr. Brown returned to see PA-C Young on August 27, 2019.  (Tr. 560-62.)  He reported continuous, stabbing back pain at a 9/10.  (Tr. 561.)  He had recently run out of bone growth stimulator, which he had used 147 times since February 2019.  (*Id.*)  He walked and transferred without difficulty and denied lower extremity pain, weakness, or numbness.  (*Id.*)  PA-C Young noted increased kyphosis at his midthoracic midline, where he reported experiencing burning pain.  (*Id.*)  His spinal examination showed no palpable tenderness or local deformity and "his lower extremity motor" was strong and symmetric with "slow and cautious walking."  (Tr. 561-62.)  Lumbar x-rays taken that same day noted stable hardware, no change in alignment at L5-S1, and degenerative endplate changes in the upper lumbar spine indicating disc degeneration. (Tr. 562; *see* Tr. 557-58.)  Mr. Brown opted to continue conservative pain management strategies rather than more invasive pain management or a second surgery.  (*Id.*)

Mr. Brown followed up with Dr. Smallwood on September 23, 2019.  (Tr. 403-06.)  He continued to report low back pain but denied it was getting worse.  (Tr. 404.)  He was not interested in further surgery or additional medication/pain management.  (*Id.*)  He elected to continued medical marijuana.  (*Id.*)  He had no constitutional, neurological, or psychological deficits on examination.  (Tr. 405.)

A January 13, 2020 x-ray of the lumbar spine showed no significant change from August 2019.  (Tr. 569-71.)  Mr. Brown attended a follow-up with Dr. Crowell in spinal surgery that same date.  (Tr. 572-75.)  He reported aching, sharp, and shooting continuous back pain that was 7/10.  (Tr. 573.)  He denied focal weakness but reported "marked" activity restriction with sitting, standing, and walking.  (*Id.*)  Pain was improved with Tylenol and medical marijuana, and he was also taking diazepam, doxepin, hydroxyzine, and nicotine polacrilex.  (*Id.*)  On reviewing the x-ray, Dr. Crowell noted that the surgical hardware was in good position without evidence of failure.  (Tr. 574.)  He also noted a "reasonable amount of bone mass."  (*Id.*)  He diagnosed Scheuermann's kyphosis and pseudoarthrosis of lumbar spine.  (*Id.*)  Further surgery was discussed as "continued findings suggest[ed] failure of fusion" of the anterior lumbar interbody fusion, but Mr. Brown was not sure he wanted further surgery due to fear of complications.  (Tr. 575.)  Dr. Crowell advised against extreme or repetitive trunk bending or twisting or lifting over 20 pounds.  (*Id.*)

### ii.     Evidence Postdating May 2020 Decision

Mr. Brown followed up with Dr. Crowell on August 17, 2020, after presenting at the emergency department a few days earlier due to a marked increase in pain.  (Tr. 582.)  A CT of the lumbar spine from the ER showed postsurgical and degenerative changes without acute abnormality and no evidence of severe spinal canal stenosis.  (Tr. 585.)  Mr. Brown reported ongoing low back pain that was 9/10.  (*Id.*)  A revision of the fusion surgery was discussed, but Mr. Brown needed to quit smoking before it became an option.  (*Id.*)  On examination, he was alert, appeared in moderate distress, walked slowly and cautiously, had strong and symmetric motor in the lower extremities, and showed no palpable tenderness or local deformity of the spine.  (*Id.*)

6

On September 28, 2020, Mr. Brown presented to Maegan Alexander, APRN-CNP at Wyandot Memorial Hospital Physician Services for a routine follow-up after undergoing facet joint injections in his lower back.  (Tr. 427-30.)  The injections provided 80% pain relief for the first five days, but Mr. Brown went to the emergency room when his pain returned.  (Tr. 427.) He was prescribed Norco, which he said did not help; but he also reported his severe pain was somewhat better.  (*Id.*)  He rated his usual pain as 5/10, located across the waistband region. (*Id.*)  His physical examination noted: tenderness and pain in the lumbar back and over the bilateral lumbar facet joints, worse over the L3-L4, L4-L5 level; increased pain with facet loading; negative seated straight leg raises; and strong motor strength bilaterally in the lower extremities.  (Tr. 429.)  APRN Alexander discontinued meloxicam, started diclofenac 75 mg a day for pain, and recommended returning in four to six weeks.  (Tr. 430.)

Mr. Brown underwent another CT scan of the lumbar spine on October 7, 2020.  (Tr. 589-91.)  The scan revealed no significant changes since February 4, 2019, with no acute fracture or traumatic malalignment, no visualized hardware complications, and small bilateral foraminal endplate osteophytes resulting in minimal bilateral foraminal narrowing.  (Tr. 591.)

Mr. Brown followed up with APRN Alexander on November 9, 2020 (Tr. 422-26), reporting worsening pain, sleep, and functioning (Tr. 423).  APRN Alexander recommended a second set of medial branch blocks to determine if radial frequency ablation would be appropriate.  (*Id.*)  Mr. Brown declined, stating he would not undergo radial frequency ablation. (*Id.*)  He also declined follow-up with his spine surgeon and said he would not take routine medications such as gabapentin.  (*Id.*)  He agreed to try Zanaflex as needed to supplement diclofenac.  (*Id.*)  On physical examination, Mr. Brown was not in acute distress and displayed no motor weakness (including in the lower extremities), but he reported increased low back pain

with bilateral hip flexion and seated straight leg raise.  (Tr. 425.)  APRN Alexander also noted mild tenderness over the lower lumbar facet joints, increased pain with facet loading, and intact sensation in bilateral lower extremities.  (*Id.*)  She noted that the most recent CT scan showed mild degenerative disc disease in the lumbar spine.  (Tr. 426.)

Mr. Brown returned to see APRN Alexander on December 16, 2020, reporting continued severe pain despite activity modification, physical therapy, NSAIDs, and muscle relaxers.  (Tr. 419.)  An MRI was ordered to aid in determining next treatment steps.  (Tr. 422.)  The December 30, 2020 MRI showed a stable appearance of the lumbar spine, mild multilevel discogenic disease and facet joint arthropathy without evidence of central spinal canal stenosis, and postsurgical changes from the prior interbody fusion surgery at L5/S1 level with minimal bilateral foraminal narrowing at this level only.  (Tr. 431-36.)

On January 18, 2021, Mr. Brown saw APRN Alexander via telemedicine.  (Tr. 415-17.)  His overall pain was 8/10 across the waistband region.  (Tr. 415.)  Based on the MRI results, APRN Alexander recommended a second set of diagnostic facet joint injections to determine if radiofrequency ablation would be appropriate, and Mr. Brown agreed to proceed.  (Tr. 416.)  APRN Alexander diagnosed chronic low back pain, degenerative disc disease lumbar, lumbar spondylosis, lumbosacral spondylosis without myelopathy, lumbar post-laminectomy syndrome, and COPD.  (Tr. 418.)  She made no medication changes, ordered bilateral facet joint injections, and recommended physical therapy exercises at home.  (*Id.*)

On January 25, 2021, Mr. Brown attended an appointment at Marion Area Physicians with Emily R. Brown, CNP.  (Tr. 592-96.)  He reported his pain was 7/10.  (Tr. 593.)  He was informed that Dr. Crowell was no longer recommending additional lumbar surgery since the October 2020 CT scan showed a solid fusion.  (Tr. 594.)  On physical examination, Mr. Brown

displayed strong and symmetric lower extremity motor ability and antalgic/waddling gait.  (Tr. 595.)  He could toe and heel walk with encouragement, had pain with lumbar range of motion in all directions, had decreased lumbar range of motion, and had pain to light touch in the lumbosacral region.  (*Id.*)  A spinal examination showed hypo-lordosis of lumbar spine but no thoracic kyphosis.  (*Id.*)  CNP Brown ordered x-rays of the lumbar spine, which took place on January 26, 2021.  (Tr. 597-600.)  The x-rays showed moderate degenerative changes with multilevel chronic wedge compression fractures and exaggerated lumbar lordosis, no dynamic instability, and stable L5-S1 interbody fusion.  (Tr. 599.)

Mr. Brown received facet joint injections at L3-L4 and L4-L5 on June 2, 2021, overseen by Bret M. Bahn, M.D., at Wyandot Memorial Hospital.  (Tr. 667-68.)  The following month, he underwent a radiofrequency ablation branch block at L3, L4, and L5.  (Tr. 662.)

On September 15, 2021, Mr. Brown attended a follow-up appointment with Dr. Bahn. (Tr. 657-661.)  He expressed concern about an upcoming fishing trip due to continued lower back pain following the radiofrequency ablation.  (Tr. 658.)  Dr. Bahn advised it can take 10-12 weeks for patients to feel relief from this procedure.  (*Id.*)  On physical examination, Mr. Brown had decreased range of motion, spasms, and tenderness in the lumbar back, tenderness to palpation over bilateral lower lumbar facet joints, some increased pain with facet loading, and significant tenderness over the L5 vertebral body areas consistent with his fusion site.  (Tr. 660.) Dr. Bahn diagnosed post laminectomy syndrome of lumbosacral region and prescribed Daypro 600 mg twice daily to treat pain.  (Tr. 661.)

On September 28, 2021, Dr. Brown presented to Dr. Smallwood for a checkup.  (Tr. 763-68.)  Dr. Smallwood noted that Mr. Brown had been using medical marijuana for worsening anxiety recently and that he had not needed his inhaler for COPD.  (Tr. 765.)   He had no

constitutional, cardiovascular, pulmonary, or neurological deficits on examination.  (Tr. 767.)

Dr. Smallwood continued Mr. Brown's medications.  (Tr. 766.)

Mr. Brown returned to see Dr. Smallwood on December 21, 2021, for a medication refill

and disability paperwork.  (Tr. 779-82.)  He said he could not work because of his lower back

impairment.  (Tr. 782.)  He had no neurological or constitutional deficits on examination.  (*Id.*)

Mr. Brown attended physical therapy with Trevor Barth, PT, on April 14, 2022, at Dr.

Smallwood's referral.  (Tr. 1132-36.)  He rated his pain as 9/10 in the lower back with shooting

pain up the spine.  (Tr. 1133.)  A physical examination showed mass loss of range of motion in

the lumbar spine and 4/5 hip and knee flexion on the right and left leg.  (Tr. 1134.)  Mr. Brown's

activity tolerance was limited by pain, which affected his functional mobility, but his prognosis

was good.  (*Id.*)  PT Barth recommended four weeks of therapy, twice a week.  (Tr. 1135.)

On May 10, 2022, Mr. Brown attended his sixth physical therapy appointment with PT

Barth.  (Tr. 1351-54.)  He reported that he did not feel better with therapy, not even temporarily.

(Tr. 1352.)  Since starting, he had continued to display poor posture, could only sit for a few

minutes due to pain, could not lay on the exam table due to pain, showed mass loss of flexion

and extension with pain, and reported his pain was 8/10 without medication.  (Tr. 1353.)  He

reported being able to walk only a quarter mile, sit or stand no more than 10 minutes, sleep less

than four hours a night, and lift only medium weights.  (Tr. 1354.)  He experienced pain while

caring for personal hygiene, which he did slowly and carefully.  (*Id.*)  As physical therapy had

not been helpful, PT Barth discharged him and referred him back to his doctor.  (*Id.*)

Mr. Brown attended a new patient pain management appointment with Aleksey

Alexander Prok, M.D., at Marion Area Physicians on June 3, 2022.  (Tr. 1099-1104.)  He

complained of aching, burning, dull, sharp, and throbbing pain in the upper, middle, and lower

back that was 8/10 in severity.  (Tr. 1100.)  Standing and walking exacerbated his pain.  (*Id.*)  He was not taking any opioid medication.  (*Id.*)  A physical examination was positive for arthralgia and gait problem, obesity, tenderness, anxiety, and a cough.  (Tr. 1103.)  A spinal examination revealed tenderness in the lumbar spine, abnormal extension, flexion, lateral bending, and rotation in both directions, and full strength in both quadriceps.  (Tr. 1103-04.)  Dr. Prok offered a spinal cord stimulator trial, but Mr. Brown refused.  (Tr. 1104.)  He continued Valium as needed and THC (medical marijuana).  (*Id.*)

On November 15, 2022, Mr. Brown followed up with Dr. Smallwood after a recent hospital admission for chest pain related to a non-ST elevated myocardial infarction ("NSTEMI") with some dyspnea on exertion.  (Tr. 1070-73; *see* Tr. 1295, 1301.)  He was diagnosed with coronary artery disease and associated ischemic cardiomyopathy.  (Tr. 1070.)  A stent had been inserted, and Mr. Brown was started on dual antiplatelet therapy consisting of Entresto, spironolactone, high does tatin, and a beta blocker.  (*Id.*)

On December 25, 2022, Mr. Brown again presented at the Wyandot Memorial Hospital emergency room with a "cold" feeling in his chest but denied pain and dyspnea.  (Tr. 1219.)  An EKG was normal, and a physical examination showed no acute distress, clear lungs, normal heartrate with no murmurs, radial pulses 2+ equal bilaterally, and no acute musculoskeletal deformities.  (Tr. 1221.)  Mr. Brown diagnosed with an NSTEMI and elevated troponin and was admitted to the hospital.  (Tr. 1223.)  He was discharged on December 27, 2022 with prescriptions for Imdur, increased Entresto, and his other medications.  (Tr. 1158-59.)

On January 23, 2023, Mr. Brown presented to Kyle Feldmann, M.D., at Ohio Health Physical Group for a cardiology follow-up.  (Tr. 1142-47.)  Dr. Feldmann noted that Mr. Brown was doing well after a staged intervention for coronary artery disease, ischemic cardiomyopathy,

hypertensive heart disease, hyperlipidemia, and episodic tachycardia.  (Tr. 1142.)  Mr. Brown was wearing a monitor to evaluate his tachycardia, and Dr. Feldmann scheduled a repeat echocardiogram in three months.  (*Id.*)  He diagnosed coronary artery disease involving native coronary artery with angina pectoris, chronic systolic heart failure, and ischemic cardiomyopathy (Tr. 1146) and prescribed 81 mg aspirin to be taken daily (Tr. 1145).  Mr. Brown began a cardiac rehab program on February 10, 2023.  (Tr. 1211-1216.)

Mr. Brown followed up with Dr. Smallwood on September 11, 2023.  (Tr. 1410-14.)  He continued to take his heart medication and an echocardiogram from earlier in the year showed his ejection fraction had normalized, though his blood pressure was trending upward.  (Tr. 1410.)  His low back pain was stable and managed with medical marijuana (*id.*), and his cardiomyopathy symptoms had resolved (Tr. 1213).  He had no constitutional or neurological deficits on examination.  (Tr. 1412.)  Dr. Smallwood ordered updated blood work.  (Tr. 1412-13.)

On January 17, 2024, Mr. Brown attended another appointment with Dr. Smallwood.  (Tr. 1386-89.)  He reported that his low back pain was a little worse, and he was awaiting a new appointment with pain management.  (Tr. 1387.)  He had no neurological or other deficits on examination.  (Tr. 1389.)

Mr. Brown attended an appointment at Ohio Health Physician Group Pain Management Marion, on February 18, 2024, with Jamesetta Lewis, D.O.  (Tr. 1454-59.)  He complained of persistent pain in the lower back, buttocks, and legs with exacerbating factors of bending forward, and sitting, standing, or walking for extended periods.  (Tr. 1454.)  He reported that the pain felt like being beaten with a baseball bat on bad days but was currently at a 3/10.  (*Id.*)  He experienced occasional leg weakness and found relief by lying on a Tempur-Pedic mattress and using heat therapy.  (*Id.*)  His pain did not interfere with the ability to bathe, dress or groom, he

12

slept four hours a night, and he walked about a mile a day. (*Id.*) On examination, Mr. Brown had 4/5 motor strength in both legs, lumbar flexion limited to 90 degrees, no lumbar extension, a negative straight leg raise test bilaterally, diminished sensation in the left leg at the L5 dermatome, diminished reflexes at S1 bilaterally, and tenderness at L4-5 and L5-S1. (Tr. 1457.) He also had normal toe walking but was unable to perform heel walking due to poor balance. (*Id.*) Dr. Lewis diagnosed Mr. Brown with chronic pain syndrome, degeneration of lumbar or lumbosacral intervertebral disc, postural kyphosis of thoracic region, myofascial pain syndrome, compression fracture of lumbar vertebra, and post laminectomy syndrome of the lumbar region. (Tr. 1458.) She prescribed gabapentin, discontinued diclofenac gel as ineffective, ordered UDS and x-rays of lumbar and thoracic spine, and discussed a possible narcotics trial and other interventions with Mr. Brown. (*Id.*)

Mr. Brown returned to see Dr. Lewis on March 29, 2024, and reported that he had stopped using gabapentin due the side effects. (Tr. 1492.) He continued to use marijuana and inquired about other non-narcotic medications that were not NSAIDs. (*Id.*) On examination, he had an antalgic gait, expiratory wheezes on both lungs upon auscultation with unlabored respirations, and a normal heart rate and rhythm. (Tr. 1494.) A lumbar/thoracic examination showed full strength in both legs, 2/4 patellar reflex and Achilles reflex bilaterally, and intact sensation in both legs. (*Id.*) Dr. Lewis diagnosed Mr. Brown with degenerative disc disease, lumbar and chronic pain syndrome. (Tr. 1495.) She started Lidoderm patches, ordered a TENS unit, and ordered an x-ray of the lumbar and thoracic spines. (*Id.*)

2.    **Opinion Evidence**

i.    **Treating Sources**

a)  **Emily R. Brown, CNP**

On January 25, 2021, CNP Brown wrote a letter in support of Mr. Brown's SSI application.  (Tr. 1562-63.)  She stated that Mr. Brown's lower back pain had not improved since his 2018 surgery and greatly impacted his daily functioning and productivity.  (Tr. 1562.)  She opined that Mr. Brown had the following impairments: slow and waddling gait with antalgic pattern related to ongoing chronic lumbar pain; limited range of motion in the lumbar spine with pain production in all directions of motion; and thoracic kyphosis on spine examination.  (*Id.*) He could sit, stand, and walk for no more than two consecutive hours in an eight-hour workday, could only lay flat without limitation, could lift no more than 10 pounds from the floor, and could not twist his trunk or bend without producing severe pain.  (Tr. 1563.)  CNP Brown further opined that Mr. Brown "is permanently disabled as a result of chronic low back pain status post lumbar spinal fusion surgery," "meets Social Security listing 1.03 Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint," and "meets the functional requirements for a musculoskeletal listing described at section 1.00 Musculoskeletal System of the listings."  (*Id.*)

b)  **Christopher Smallwood, M.D.**

Mr. Brown's primary care provider Dr. Smallwood completed a medical source statement on December 23, 2021.  (Tr. 769-72.)   He noted Mr. Brown's diagnosis of spondylolisthesis, his symptoms of constant, daily, throbbing, lumbar pain exacerbated by prolonged sitting, standing, and walking, and clinical findings of abnormal MRI and CT scan.  (Tr. 769.)

Dr. Smallwood opined that Mr. Brown could sit for 15 minutes at one time and about two hours total in an eight-hour workday, stand for 10 minutes at one time, and stand/walk for less

than two hours in an eight-hour workday.  (Tr. 770.)  He needed to walk around for five minutes every 15 minutes and would need to take a 10-15-minute break five or six times during the workday due to his pain/parathesis.  (*Id.*)  He required a cane or other hand-held assistive device some of the time for walking and standing due to pain.  (Tr. 771.)  Dr. Smallwood further opined that Mr. Brown could never lift over 50 pounds, rarely lift 10-20 pounds, and occasionally lift less than 10 pounds; he would likely be off task 25% or more of the workday; and he was incapable of even "low stress" work.  (*Id.*)  His impairments would cause him to be absent more than four days per month.  (Tr. 772.)

Dr. Smallwood completed a second medical source statement on July 25, 2024.  (Tr. 1558-60.)  He noted Mr. Brown's diagnoses of spondylolisthesis and cardiomyopathy, his symptoms of chronic back pain, exercise intolerance, and dyspnea on exertion, and clinical findings of antalgic gait and abnormal CT and MRI of the spine.  (Tr. 1558.)

Dr. Smallwood opined that Mr. Brown could: sit for 30 minutes at a time and four hours total in an eight-hour workday; stand for 10 minutes at a time; and stand/walk about two hours total in an eight-hour workday.  (Tr. 1559.)  He needed to walk for 10 minutes every 20 minutes in an eight-hour workday and would require unscheduled, 15-20-minute breaks six to seven times during the workday due to chronic fatigue, pain, and adverse effects of medication.  (*Id.*)  He required a cane or other hand-held assistive device some of the time for walking and standing due to pain and dizziness.  (Tr. 1560.)  He could rarely lift 50 pounds, occasionally lift 10-20 pounds, and frequently lift less than 10 pounds; he would be off-task 25% or more of the workday; he was capable of low-stress work; and he would be absent more than four days per month.  (*Id.*)

15

### ii.    State Agency Medical Consultants

On September 28, 2021, state agency medical consultant Abraham Mikalov, M.D., conducted a physical RFC assessment of Mr. Brown.  (Tr. 164-66.)  Dr. Mikalov considered the 2020 ALJ decision and adopted the same postural limitations.  (Compare Tr. 143 with Tr. 164-65.)  He found that Mr. Brown's allegation of COPD was a new and material change that required additional environmental limitations.  (Tr. 165-66.)  He opined that Mr. Brown could: lift and carry ten pounds occasionally and less than ten pounds frequently; stand or walk for four hours and sit for six hours in an eight-hour workday; occasionally balance, stoop, crouch, and climb ramps and stairs; never crawl, kneel, or climb ladders, ropes, and scaffolds; avoid moderate exposure to extreme cold, heat, wetness, humidity, and fumes, odors, dusts, gases and poor ventilation; and avoid all exposure to vibrations and hazards such as machinery or unprotected heights.  (Tr. 164-65.)  On reconsideration on November 30, 2021, state agency medical consultant Diane Manos, M.D., affirmed Dr. Mikalov's findings.  (Tr. 174-76.)

## C.    Function Reports[1]

Mr. Brown completed an Adult Function Report on July 7, 2021.  (Tr. 292-95.)  He lived in a house with his uncle.  (Tr. 292.)  He was unable to work because he could only stand for 15 minutes and sit for 5 minutes, could not bend over more than a couple times a day, and had to lie down for at least 30 minutes at a time.  (*Id.*)  When he woke up, he did nothing.  (Tr. 293.)  He did not care for any other person or animal.  (*Id.*)  Before the onset of his conditions, he could do "everything," including fish, go to the movies, take family vacations, and hike.  (*Id.*)

---

[1] In addition to Mr. Brown's own Adult Function Report, the record contains two Third Party Function Reports: one from Mr. Brown's uncle, Wesley Weatherholtz, dated January 10, 2022 (Tr. 319-26) and one from his sister, Hollie Barber, dated January 13, 2024 (Tr. 1046-52).  As their reports of Mr. Brown's functioning are substantively similar to his own, they are not summarized herein.

16

Mr. Brown's conditions caused him to sleep lightly, tossing and turning all night due to pain.  (*Id.*)  He could wash his hair, shower with a shower chair, and dress himself, but he had difficulty bending over to tie his shoes.  (*Id.*)  He did not have problems shaving, feeding himself, or using the toilet.  (*Id.*)  He did not go outside except on flat ground due the risk of falling; during winter he did not go out at all.  (Tr. 294.)  When he left the house, he took a car and drove himself, although he only did so rarely as it increased his pain.  (*Id.*)  He shopped for food and clothing on the computer and less often at stores.  (*Id.*)

Mr. Brown was able to count change and handle a savings account but could not pay bills as he did not have money.  (*Id.*)  His ability to handle money was not affected by his conditions.  (*Id.*)  He took medication and denied any side effects.  (Tr. 295.)

## D.    Hearing Testimony

### 1.    Plaintiff's 2022 Testimony

At the hearing on April 5, 2022, Mr. Brown responded to questioning by the ALJ and his attorney.  (Tr. 106-33.)  Mr. Brown testified that he had not worked since the prior ALJ issued her 2020 decision.  (Tr. 112.)  He had completed 11th grade and did not have his GED.  (*Id.*)  He knew how to read and write and could count change.  (Tr. 113-14.)

Since Mr. Brown appeared before the prior ALJ, his conditions had worsened.  (Tr. 113.)  Since the prior hearing, he had tried cortisone shots, nerve blocks, and radiofrequency ablation to relieve his pain.  (Tr. 121.)  The first cortisone shot relieved his pain for five days, but since then none of the treatment had helped.  (*Id.*)

Regarding his pain, Mr. Brown said his "whole back was messed up," but he felt the most pain in his spine, at the site of the hardware from his surgery.  (Tr. 122.)  He was in pain "all day every day," and only experienced relief when he took the narcotics prescribed for him after his

17

surgery.  (*Id.*)  His pain worsened when he stood or sat for too long.  (*Id.*)  On a good day, he could walk or stand for 10-15 minutes before needing to sit and could sit for 10-15 minutes before needing to stand.  (Tr. 114.)  He was not supposed to lift more than 20 pounds.  (*Id.*)  His back pain also became worse when he stepped off a curb or rode in a car.  (Tr. 122.)

Mr. Brown had tried "countless" pain medications and was taking several non-narcotics. (Tr. 115.)  He took Valium as needed for anxiety and Zanaflex as needed for upper back pain. (Tr. 116.)  However, he only took these medications about twice a month because they could be addictive.  (*Id.*)  He had his medical marijuana card and found marijuana helpful to treat anxiety. (Tr. 117.)  The only side effect he noticed was tiredness while driving.  (*Id.*)

Mr. Brown had lived with his uncle for three to four years.  (*Id.*)  He saw other family members when they stopped by the house.  (*Id.*)  His parents usually came over two or three times a week, and his other uncle stopped by almost every day.  (*Id.*)  Mr. Brown got along well with his family members.  (Tr. 118.)

On a typical day, Mr. Brown got up, let out his dog, and visited with his uncle for 15-20 minutes before going to lie in bed.  (*Id.*)  During the day he laid in bed and watched television, only getting up for 15-minute increments to talk with his uncle.  (Tr. 118-19.)  He could shower with a shower chair and dress himself.  (Tr. 119.)  On days he had not slept well, he was in more pain and it was hard to get out of bed.  (Tr. 124.)  Then he did not change clothes but stayed in bed on his massage pad.  (*Id.*)  His uncle bought him a Tempur-Pedic mattress that could be raised up and down, and Mr. Brown only felt relief when his legs were up.  (Tr. 124-25.)  He had five or six bad days like this a week.  (*Id.*)  He often could not sleep due to pain and anxiety and had not slept for days before the hearing.  (Tr. 125.)  A good night of sleep was seven hours, and a bad night was four hours; he had not slept seven hours in a long time.  (*Id.*)

18

Mr. Brown could make a simple meal and clean up after himself if it only took a few minutes. (Tr. 119-20.) He had a dog but did not walk it. (Tr. 120.) He could not do household chores that required bending over or stretching, such as cleaning the floor or making his bed. (Tr. 122-23.) His parents and nephew came over to help him complete these tasks. (Tr. 123.)

### 2.      Plaintiff's 2024 Testimony

On February 23, 2024, Mr. Brown answered questions posed by his attorney. (Tr. 825-51.) He described lower back pain that felt like "somebody beat [him] with a baseball bat" and at times "like an ice pick" in his spine. (Tr. 828-29.) Some days the pain shot up his spine and made it difficult to lay down. (Tr. 829.) He experienced low back pain every day and shooting pain three or four times a week. (*Id.*) The pain was worsened or triggered by standing or sitting too long, bending over, twisting at the hip, and driving. (*Id.*) It caused Mr. Brown to toss and turn most nights, getting four hours of sleep a night on average. (*Id.*) This caused him to have low energy and feel irritable, sad, and anxious. (Tr. 830.) He had sleep medication that allowed him to sleep six or seven hours, but he did not take it every night because it is addictive. (*Id.*)

Mr. Brown continued to live with his uncle. (Tr. 831.) He no longer did any cooking because he could not stand in the kitchen long enough to make something that did not come in a can or a box. (*Id.*) He could wash a couple of dishes but not a full sink because he could only stand for 15-20 minutes at a time. (*Id.*) He did not do chores such as vacuuming, sweeping, and mopping. (*Id.*) His mother and nephews came to help him clean his room. (Tr. 831-32.) Mr. Brown could put his clothes in the washer and dryer but could not stand long enough to fold them, so his uncle did his laundry. (Tr. 832.) (*Id.*) He had no problems changing his clothes but could only shower with a shower chair. (*Id.*) On the days he had shooting pain in his spine, he

did not shower or change his clothes; he just laid on his Tempur-Pedic bed with his feet elevated. (*Id.*)  This happened three or four times a week and was "usually an all-day thing."  (*Id.*)

Mr. Brown could usually sit for 15-20 minutes before standing unless he was on his Tempur-Pedic mattress.  (Tr. 833.)  After sitting 15-20 minutes, he would stand for a few minutes then lie down.  (*Id.*)  After lying down for 45 minutes to an hour, he could sit in a chair for another 15-20 minutes.  (*Id.*)  Mr. Brown had started seeing a pain specialist, but his back pain had not changed much since his surgery in 2018.  (*Id.*)

Regarding his cardiac health, Mr. Brown took half a dozen pills every morning and three or four at night to control his blood pressure and heartbeat.  (*Id.*)  He dealt with a spiking blood pressure or pulse "90% of the time," and experienced chest pains two or three times a week. (*Id.*)  The chest pain felt like a "tight stabbing" in the middle of his chest, and sometimes it felt hard to breath.  (Tr. 834.)  The chest pain, tightness, and shortness of breath did not have a specific trigger—it could occur while Mr. Brown was sitting and watching television.  (*Id.*)  He had stopped eating salt, cholesterol, and caffeine but still experienced episodes of chest pain, which could last a few minutes to an hour or two.  (*Id.*)  When they lasted longer, Mr. Brown chewed baby aspirin, which helped sometimes.  (*Id.*)

### 3. Medical Expert Testimony

Medical expert John F. Kwock, M.D., testified on February 24, 2024.  (Tr. 835-43.)  Dr. Kwock had never treated or examined Mr. Brown, but he reviewed the medical records in preparation for the hearing.  (Tr. 835.)

Based on the documents he had reviewed, Dr. Kwock testified that Mr. Brown had the medically determinable impairment: status post decompression fusion of the lumber spine.  (Tr.

836.)  This impairment did not meet or medically equal a Listing.  (*Id.*)  It had reached a level of recognizable severity in January 2018.  (Tr. 837.)

Dr. Kwock opined that limitations were warranted based on Mr. Brown's condition, and the record supported a light exertional level.  (*Id.*)  He opined that Mr. Brown could: lift and carry up to 10 pounds frequently and up to 20 pounds occasionally; sit for six hours in an eight-hour workday; and stand or walk for six hours in an eight-hour workday.  (*Id.*)  There was no evidence that a mechanical assistive device was necessary, and Mr. Brown had no upper extremity limitations.  (Tr. 838.)  He could: frequently use his feet to push, pull, or operate a pedal bilaterally; climb stairs and ramps; and balance and kneel.  (*Id.*)  He could occasionally stoop, crouch, crawl, and climb ladders and scaffolds.  (*Id.*)  He could occasionally be exposed to unprotected heights and work in proximity to heavy moving machinery.  (Tr. 838-39.)

Dr. Kwock reviewed Dr. Smallwood's opinion.  (Tr. 839.)  He said his opinion differed from Dr. Smallwood's because every reviewing physician basis their opinion on the medical facts in front of them, their training and experience, the diagnoses given, and the purpose of the opinion.  (*Id.*)  Dr. Kwock based his opinion on what he believed to be the objective facts before him.  (*Id.*)  Upon questioning by Plaintiff's attorney, Dr. Kwock said he did not think Dr. Smallwood's opinion was reasonable, and he did not find anything in the record that would support or substantiate the limitations opined by Dr. Smallwood.  (Tr. 840.)

When asked why he did not agree with Dr. Mikalov's or Dr. Manos's opinion, Dr. Kwock said he did not know who they were and that the only RFC he reviewed was Dr. Smallwood's.  (*Id.*)  It became clear that while Dr. Kwock had reviewed the medical records from Mr. Brown's treating physicians, he had not reviewed Dr. Smallwood's most recent treatment notes and had not reviewed portions of the record created by the Social Security

21

Administration ("SSA"), including the opinions of Drs. Mikalov and Manos on initial review and reconsideration of Mr. Brown's SSI application.  (Tr. 841-42.)  Dr. Kwock testified that medical experts were not usually provided the administrative materials for review.  (Tr. 843.)  Mr. Brown's attorney asked the ALJ to send Dr. Kwock interrogatories because he had not reviewed all of Dr. Smallwood's treatment records.  (Tr. 842.)  The ALJ agreed to provide Dr. Kwock with interrogatories and copies of the medical records identified by Plaintiff's attorney.  (Tr. 842-43; *see* Tr. 1427-37 (request for medical interrogatory sent February 24, 2024).)

On August 29, 2024, Dr. Kwock testified at a supplemental hearing regarding his response to the interrogatories.  (Tr. 1564-84; *see* Tr. 1469-77 (response to interrogatories).)  He had reviewed updated medical records provided by Plaintiff.  (Tr. 1569.)  He affirmed that the only medically determinable impairment was status post decompression fusion procedure on the lumbar spine, going back to January 2018, and that this impairment did not meet or medically equal a Listing.  (Tr. 1569-70.)  He affirmed his functional limitation opinion from the previous hearing with the exception that he now found the record did contain evidence that a mechanical or assistive device was medically necessary for Mr. Brown to ambulate.  (Tr. 1570-71.)

Dr. Kwock acknowledged that Dr. Smallwood's two RFC opinions differed from his.  (Tr. 1571.)  Upon questioning by Plaintiff's attorney, he stated that Dr. Smallwood "could be perfectly right. I don't know."  (Tr. 1572.)  He did not speak with Dr. Smallwood, did not know how he developed his opinion, and did not know how he thought.  (*Id.*)  In his opinion, there was no objective musculoskeletal evidence in the record that would support the level of limitation opined by Dr. Smallwood.  (Tr. 1572-73.)

Plaintiff's attorney read a portion of Dr. Smallwood's opinion into the record that identified "clinical and objective signs" that supported his opinions, including "antalgic gait,

abnormal imaging of spine." (Tr. 1573.)  Dr. Kwock stated those were objective observations, not objective findings.  (*Id.*)  He further explained that in his review of the medical records, he did not see physical examinations that contained evidence suggestive of a problem in the lumbar spine.  (Tr. 1573-74.)  The most recent MRI, from December 2020, showed no abnormalities in the lumber spine and used adjectives such as "mild," "very small," and small" to described degenerative changes in other parts of the spine.  (Tr. 1574.)  As an orthopedic surgeon, Dr. Kwock did not find that these records showed "big issues" or issues that were "pain generators." (*Id.*)  He explained that even when a patient is limping around in front of him, he must come up with a medical explanation for the condition; the objective evidence in this record did not suggest to him a person with Mr. Brown's clinical picture.  (Tr. 1574-75.)

### 4.      Vocational Expert's Testimony

A Vocational Expert ("VE") testified on February 23, 2024.  (Tr. 845-51.)  The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience, and the function limitations described in the ALJ's RFC determination could perform representative positions in the national economy, including marker, collator operator, and mail clerk.  (Tr. 846.) If a sit/stand opinion were added, allowing the individual to alternate positions in the immediate vicinity of the workstation every 30 minutes while remaining on task at least 90% of the workday, the VE testified that the marker position would no longer be available, the number of mail clerk positions would be reduced by 60%, and collator operator positions would be reduced by 25%.  (*Id.*)  With this additional restriction, photocopy machine operator would be available at a reduced percentage.  (Tr. 847.)  If the hypothetical individual could only work at a sedentary level of exertion with the all the limitations included in the first two hypotheticals, available jobs would include document preparer, inspector, and table worker.  (*Id.*)  The VE also testified that it

would preclude competitive employment if the person would either be off task 15% of the workday or absent more than one day per month on a regular and ongoing basis.  (Tr. 847-48.)

If an individual could only sit for two hours and stand or walk for less than two hours, the VE testified that it would be work preclusive.  (Tr. 850.)  If an individual needed five unscheduled, 10-15 minutes breaks per day, that would also be work preclusive.  (Tr. 850-51.)

### III.    Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if

the claimant's impairment prevents him from doing past relevant work.  If
the claimant's impairment does not prevent him from doing his past relevant
work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if,
      based on his vocational factors and residual functional capacity, he is
      capable of performing other work that exists in significant numbers in the
      national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy.  *Id.*

## IV.    The ALJ's Decision

In his September 19, 2024 decision, the ALJ made the following findings:[2]

1.    The claimant has not engaged in substantial gainful activity since May 5,
      2021, the application date.  (Tr. 803.)

2.    The claimant has the following severe impairments: COPD; major
      depressive disorder; anxiety disorder; degenerative disk disease of the
      lumbar and thoracic/scoliosis/Scheuermann's kyphosis, status post-
      laminectomy syndrome/spondylolisthesis/spondylolysis; ischemic
      cardiomyopathy/hypertensive heart disease and asymptomatic episodic
      tachycardia.  (*Id.*)

3.    The claimant does not have an impairment or combination of impairments
      that meets or medically equals the severity of the listed impairments in 20
      C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 804.)

4.    The claimant has the residual functional capacity to perform light work as
      defined in 20 CFR § 416.967(b) except: occasionally climbing ladders,
      ropes, or scaffolds; frequently climbing ramps and stairs; frequent
      balancing and kneeling; occasional stooping, crouching, and crawling;
      frequent use of bilateral lower extremities for pushing, pulling, and
      operation of foot controls. Environmental limitations to avoid more than
      occasional concentrated exposure to moving mechanical parts, vibrations,

---

[2] The ALJ's findings are summarized.

high exposed areas, and irritants such as fumes, odors, dust, gases, extreme cold, extreme heat, humidity, and wetness.  He can: understand, remember, and carry out simple instructions for work not requiring hourly quotas or a specific production rate pace, such as assembly line work; use judgment to make simple, work-related decisions, with occasional changes in a routine work setting; and tolerate occasional interaction with the general public, coworkers, and supervisors.  (Tr. 807.)

5.  The claimant has no past relevant work.  (Tr. 815.)

6.  The claimant was born on September 27, 1984 and was 36 years old, defined as a younger individual, on the date the application was filed.  (*Id.*)

7.  The claimant has a limited education.  (*Id.*)

8.  Transferability of job skills is not an issue because the claimant has no past relevant work.  (*Id.*)

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including marker, collator operator, and mail clerk.  (Tr. 816.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 5, 2021, the date the application was filed.  (*Id.*)

## V.  Plaintiff's Arguments

Plaintiff brings three assignments of error: (1) the ALJ failed to comply with the remand order and incorrectly applied res judicata in his review of the 2020 ALJ decision when he found that new and material evidence showed Plaintiff could work at the light exertional level rather than the sedentary exertional level (ECF Doc. 8, pp. 10-15); (2) the ALJ failed to comply with the remand order when he did not properly evaluate the treating source medical opinions (*id.* at pp. 15-24); and (3) the ALJ failed to provide a record of the supplemental hearing (*id.* at p. 24). This last assignment of error was addressed when the Commissioner supplemented the record with a transcript of the supplemental hearing.  (ECF Doc. 11.)

26

## VI.     Law & Analysis

**A.     Standard of Review**

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

Because the Court concludes that the error alleged in Plaintiff's second assignment of error warrants remand, the Court addresses the assignments of error out of order.

**B.**     **Second Assignment of Error: The ALJ Did Not Adequately Explain His Evaluation of the Consistency of Treating Source Chris Smallwood, M.D.'s Medical Opinion**

In his second assignment of error, Plaintiff argues that the ALJ failed to properly evaluate the medical opinions of treating sources Dr. Smallwood and CNP Brown.  (ECF Doc. 8, pp. 15-24.)  In particular, he argues that the ALJ "offered an inadequate analysis" and "failed to proffer a coherent explanation" in support of his findings regarding Dr. Smallwood's opinion.  (*Id.* at p. 20.)  The Commissioner argues in response that the ALJ reasonably discounted the treating medical opinions, explained his findings, and made findings that were supported by substantial evidence.  (ECF Doc. 13, pp. 7-8.)

**1.      Framework for the Evaluation of Medical Opinion Evidence**

The SSA's regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020).  The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. §§ 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 404.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

As to supportability, the regulations state: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  In other words, "supportability" is the extent to which a medical source's own objective findings and supporting explanations substantiate or support the findings in the opinion.

As to consistency, the regulations state: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(2).  In other words, "consistency" is the extent to which a medical source's opinion findings are consistent with the evidence from other medical and nonmedical sources in the record.

In reviewing an ALJ's medical opinion analysis, courts must consider whether the ALJ: considered the full record in assessing the persuasiveness of the opinion; appropriately articulated his reasons for finding the opinion unpersuasive; and made findings supported by substantial evidence.  *See* 20 C.F.R. § 404.1520c (governing how ALJs consider and articulate findings re: medical opinions); 20 C.F.R. § 404.1520(e) (findings re: RFCs will be "based on all the relevant medical and other evidence" in the case record); *see also Blakley*, 581 F.3d at 405.

### 2.     The ALJ Did Not Adequately Explain His Findings Regarding the "Consistency" of Dr. Smallwood's Medical Opinions and Failed to Build an Accurate and Logical Bridge Between the Evidence and the Result

The ALJ analyzed Dr. Smallwood's medical opinions as follows:

> The undersigned finds Dr. Smallwood's opinion not entirely persuasive, as it is inconsistent with the medical record as a whole. . . . [3] Furthermore, such extreme limitations are not supported by the medical evidence of record. The medical evidence[] of record supports a finding that the claimant is more capable than Dr. Smallwood opined. Dr. Smallwood's opinion is supported by the findings documented in their own notes, which includes that the claimant has "limited mobility due to spinal disease and a subsequent fusion procedure" (Exhibit B11F at 4). Additionally, Dr. Smallwood noted, the claimant's "pain and cardiac disease severely limits his activity level" (Exhibit B28F at 3). However, Dr. Smallwood's opinion is inconsistent with the objective findings reported by other sources, which includes that the claimant noted that his "pain does not interfere with ability to bathe, dress, or groom." For exercise, the claimant was walking daily, approximately one mile per day (Exhibits B22F at 13, B25F at 1). This is not consistent with severe limits his [sic] activity level.

(Tr. 812 (emphasis added).)  Thus, the ALJ addressed "supportability" by concluding that specific "findings documented in [Dr. Smallwood's] own notes" supported his medical opinions, and addressed "consistency" by finding generally that: the opinions are "inconsistent with the medical record as a whole"; the "extreme limitations are not supported by the medical evidence of record"; and the opinions are "inconsistent with the objective findings reported by other

---

[3] Since the parties focus their arguments on Dr. Smallwood's opinions as to Plaintiff's physical limitations, the ALJ's discussion and analysis of Dr. Smallwood's opinion that Plaintiff is unable to perform "low stress work" is not summarized above or otherwise addressed in this Court's analysis.

sources." (Tr. 812.)  Although the ALJ bases his consistency analysis on a determination that *objective* findings from other medical sources are inconsistent with Dr. Smallwood's opinions, the only evidence he cites in support are Plaintiff's *subjective* statements—in a single physical therapy note—that pain does not interfere with his ability to bathe, dress, and groom, and that he was walking daily, approximately one mile per day. (Tr. 812 (citing Tr. 1454, 1481).)

Plaintiff argues that the treatment note cited in support of the ALJ's consistency finding actually supports Dr. Smallwood's opinions, noting that the physical examination findings from that visit—the *objective* clinical findings—note diminished sensation in the left leg at the L5 dermatome, diminished reflexes at S1 bilaterally, and tenderness. (ECF Doc. 8, p. 17 (citing Tr. 1457).)  Indeed, the examination findings from that visit also note 4/5 motor strength in both legs, limited lumbar flexion, absent lumbar extension, an inability to perform Faber's test due to increased back pain, and an inability to perform heel walking due to poor balance. (Tr. 1457.) Plaintiff also argues that the objective findings in other medical records support Dr. Smallwood's opinion and further asserts that the ALJ failed to provide a coherent explanation for his conclusions regarding the persuasiveness of Dr. Smallwood's opinions. (ECF Doc. 8, p. 20.)

The Commissioner offers two arguments in support of the ALJ's persuasiveness findings. (ECF Doc. 13, p. 7.)  Unfortunately, the first argument misrepresents the ALJ's written findings and supporting citations.  The Commissioner asserts that the ALJ "noted Dr. Smallwood's opinion was *not fully supported by* his own findings," highlighting physical examination findings from two treatment visits with Dr. Smallwood that the ALJ purportedly cited in support of his opinion analysis, noting that Dr. Smallwood "failed to specifically examine Plaintiff's back." (*Id.* (citing "Tr. 812 (citing 782, 1389)") (emphasis added).)  In fact, the ALJ found that "Dr. Smallwood's opinion is *supported by* the findings documented in [his] own notes," and did not

cite either of the records identified by the Commissioner in support of his opinion analysis. (Tr. 812 (emphasis added) (citing Tr. 772, 1560).) While the ALJ did cite portions of the referenced treatment visits in his summary of the medical records, he only discussed Plaintiff's subjective reports at those visits, without any reference to Dr. Smallwood's clinical examination findings. (*See* Tr. 810 (citing Tr. 782 ("In December 2021, the claimant noted that he was not working and believes that he is unable to work, due to back pain. He asked for disability paperwork to be completed."); Tr. 1387 ("In January 2024, the claimant was complaining of low back pain, and he stated his pain is 'a little worse right now.' He is awaiting a new appointment with pain management.")).) Because the Commissioner's first argument in support of the ALJ's opinion analysis relies on both misstatements and post hoc rationalizations, it is unconvincing.

In his second argument, focusing on the ALJ's consistency analysis, the Commissioner asserts: "the ALJ explained Dr. Smallwood's opinion was inconsistent with Plaintiff's own statements that pain did not interfere with his ability to bathe, dress, or groom." (ECF Doc. 13, p. 7 (citing Tr. 812, 1454).) But this brief argument does not address or account for the fact that the ALJ specifically stated that Dr. Smallwood's opinions were inconsistent with "the *objective findings* reported by other sources," but exclusively cited and referenced Plaintiff's *subjective statements* regarding daily activities to support that finding. (Tr. 812 (emphasis added).)

It is well established that "'[a]n agency's actions must be upheld, if at all, on the basis articulated by the agency itself,' . . . and not based on 'appellate counsel's post hoc rationalization[s].'" *Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 808 (6th Cir. 2018) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) and *Comcast Cablevision-Taylor v. N.L.R.B.*, 232 F.3d 490, 497 (6th Cir. 2000)). Certainly, it is not this Court's role "to scour the record for evidence . . . which the ALJ *might* have relied on and

which *could* support a finding of no-disability *if* the ALJ actually considered it."  *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 754 (6th Cir. 2011) (emphasis in original).

Nevertheless, an ALJ need not restate information he articulated earlier in his decision to support a later analysis.  *See Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (citing *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014)); *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006) (finding an ALJ need not "spell out every fact a second time").  He also need not "discuss each piece of data in [his] opinion, so long as [he] consider[s] the evidence as a whole and reach[es] a reasoned conclusion."  *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507-08 (6th Cir. 2006) (per curiam)).

The Court will therefore consider whether the ALJ's earlier summary of the medical records sheds light on his later conclusion that "Dr. Smallwood's opinion is inconsistent with the objective findings reported by other sources."  (Tr. 812.)  In that written summary, the ALJ discussed: Mr. Brown's 2018 lumbar surgery and associated x-rays (Tr. 808-809); his complaints of ongoing pain in 2019, with associated treatment and use of a bone growth stimulator (Tr. 809); his complaints of ongoing pain in 2020, observations of his gait in January 2020, an October 2020 CT scan, and discussion of his treatments and treatment recommendations (*id.*); a January 2021 lumbar x-ray, a July 2021 pulmonary function test, and Plaintiff's treatments for various conditions in 2021 (*id.*); Plaintiff's statements to providers in 2021 regarding his activities, pain, and perceived ability to work (Tr. 810); Plaintiff's subjective complaints, treatment with physical therapy, and cardiac treatment for an NSTEMI in 2022 (*id.*); cardiac evaluations and treatment in 2023, including a note that his ejection fraction had normalized (*id.*); and complaints of pain and pain management treatment in 2024, including plaintiff's report

33

that he could bathe, dress, and groom, and that he walked daily, and injuries from a 2024 vehicle collision (*id.*).  Thus, the objective findings discussed in the ALJ's summary of medical records spanning from 2018 through 2024 appear to be limited to the findings in a few lumbar x-rays, one lumbar CT scan, one pulmonary function test, and one echocardiogram.  Other than one observation regarding Mr. Brown's gait in January 2020, there is no discussion of physical examination findings.  This summary—which focuses largely on subjective reports and treatment modalities—sheds little light on what objective findings the ALJ intended to reference when he found Dr. Smallwood's opinion inconsistent with "objective findings reported by other sources."

The ALJ's analysis of other medical opinions provides little further assistance in understanding his assessment of Dr. Smallwood's opinion.  Indeed, the ALJ repeatedly makes the same contradictory finding that an opinion is consistent or inconsistent with "objective findings" based on the two subjective statements the ALJ cited in analyzing Dr. Smallwood's opinions.  (*See* Tr. 811 (finding opinion of CNP Brown inconsistent with "objective findings" based on Plaintiff's subjective reports); Tr. 813-14 (finding third party statement not supported by "objective findings" based on Plaintiff's subjective reports); Tr. 814 (finding opinion of Dr. Kwock consistent with "objective findings" based on Plaintiff's subjective reports).

The only opinion analysis where the ALJ actually cites to objective findings in support of his conclusion that a medical opinion was inconsistent with "objective findings reported by other sources" is his analysis of the state agency medical consultants' opinions, where he cites to a January 2021 lumbar x-ray showing a stable L5-S1 interbody fusion and a September 2023 report that Plaintiff's ejection fraction had normalized.  (Tr. 814 (citing Tr. 599, 1410).)  Notably, his description of the January 2021 x-ray leaves out an additional finding of moderate

degenerative changes with multilevel chronic wedge compression fractures and exaggerated lumbar lordosis.  (*Compare* Tr. 809, 814 *with* Tr. 599.)

Finally, in concluding his RFC analysis, the ALJ cites exclusively to Plaintiff's subjective statements regarding his activities and pain in concluding that Plaintiff's "alleged symptoms and limitations may have been overstated," without addressing any objective findings.  (Tr. 815.)  There is no discussion of what objective findings the ALJ finds supportive of the RFC, let alone an explanation as to why those findings support the ALJ's conclusions.

Having considered the ALJ's complete written decision, this Court concludes that the ALJ has failed to adequately articulate his reasons for finding Dr. Smallwood's medical opinion was "inconsistent with the medical record as a whole," and more specifically "inconsistent with the *objective* findings reported by other sources."  (Tr. 812 (emphasis added).)  In so finding, the Court has considered: the ALJ's reference only to *subjective* reports in support of this finding, even though the cited medical records did contain abnormal objective physical examination findings; the ALJ's limited discussion of objective findings in his summary of medical records spanning over six years, including virtually no physical examination findings and a shortened description of a January 2021 x-ray that leaves out significant abnormal findings; and the ALJ's repeated reliance on the same subjective reports in his analysis of other opinions, each time describing them as "objective findings."  On this basis, the Court concludes that the ALJ did not adequately articulate his analysis of the consistency of Dr. Smallwood's medical opinions and failed to build "an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877; *see id.* at 881 ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying[.]") (citations omitted).

For the reasons set forth above, the undersigned concludes that the ALJ committed reversible error and failed to build a logical bridge between the evidence and the result when he failed to clearly articulate his grounds for finding Dr. Smallwood's medical opinions were inconsistent with the "objective findings reported by other sources."  Accordingly, the undersigned finds Mr. Brown's second assignment of error is well-taken.[4]

### VII.    Conclusion

For the foregoing reasons, the Court **VACATES and REMANDS** the case pursuant to 42 U.S.C. § 405(g) sentence four, for further proceedings consistent with this Order.  On remand, the ALJ should consider the entire record and provide a clear, accurate, and well-reasoned explanation to support his findings regarding the persuasiveness of all medical opinion evidence, including the medical opinion of treating physician Christopher Smallwood, M.D., and ensure that his stated rationale builds an accurate and logical bridge between the evidence and the result.

February 11, 2026

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge

---

[4] Given this Court's determination that remand is warranted, it is unnecessary to address the first or third assignment of error or any of the sub-arguments raised in the second assignment of error.